IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **LAURIE STEELE**, | ) | Case No.: 2:23-cv-3335 |
| | ) | |
| Plaintiff, | ) | Judge Sargus |
| | ) | |
| vs. | ) | Magistrate Judge Vascura |
| | ) | |
| **NATIONWIDE CHILDREN'S HOSPITAL,** | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MOTION TO EXCLUDE
## TESTIMONY AND EXPERT REPORT OF BRETT L. KIMMELL

Pursuant to Federal Rule of Evidence 702, Defendant Nationwide Children's Hospital ("NCH") moves the Court to exclude the expert testimony of Brett L. Kimmell on the grounds that Kimmell is not qualified to opine on the matters contained in his report and he did not base his conclusions on sufficient facts and data nor use reliable principles and methods. The basis for this Motion is explained in the accompanying Memorandum in support.

Respectfully submitted,

/s/*William G. Porter*
William G. Porter (0017296), *Trial Attorney*
Daniel J. Clark (0075125)
Brian W. Dressel (0097163)
Mackenzie M. Leadston (0104771)
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street, P.O. Box 1008
Columbus, Ohio 43216-1008
Telephone/Facsimile: (614) 464-6436
*wgporter@vorys.com*
*djclark@vorys.com*
*bwdressel@vorys.com*
*mmleadston@vorys.com*

*Counsel for Defendant*

**MEMORANDUM IN SUPPORT**

**I.     INTRODUCTION**

On May 28, 2025, Plaintiff Laurie Steele disclosed Brett L. Kimmell as an expert witness concerning her alleged damages. Kimmell also offered an opinion on the causation of Plaintiff's alleged harm. Kimmell is a consultant in information technology ("IT") security who has never previously assessed damages from lost wages or any other form of damages for an individual. Among other issues with his analysis, Kimmell projected total wages without considering Plaintiff's hourly wage rate either before or after her termination by NCH, forecasted lost wages over 11 years without considering Plaintiff's willingness or ability to work, and assumed an increase in wages despite evidence that such increases do not occur in practice.

Kimmell is not an expert in forecasting economic damages. And even if he were, Kimmell considered hardly any relevant information in coming to his conclusions and could provide neither evidence that his methods were reliable or accepted in the field nor that he had applied the methods reliably. Accordingly, the Court should exclude his report and testimony from any further proceedings in this matter.

**II.     BACKGROUND**

   A.     Kimmell's Conclusions

Kimmell stated his conclusions in an expert report (the "Report") and working paper (the "Working Paper") that Plaintiff served on NCH on May 28, 2025. The Report is attached hereto as Exhibit A and the Working Paper is attached hereto as Exhibit B. The principal subject of the Report is the calculation of wages Plaintiff lost as a result of her termination by NCH. Kimmell opines that Plaintiff's damages resulting from lost wages are between $309,922 and $402,975.

1

(Report at 3.) Kimmell also opines that these financial losses resulted from NCH's "malfeasance." (*Id.* at 1.)

      B.      <u>Kimmell's Qualifications</u>

Kimmell is not an economist and has not previously conducted a lost-wages analysis. (*See* Kimmell's curriculum vitae ("Kimmell C.V."), attached hereto as Exhibit C and Deposition of Brett L. Kimmell ("Kimmell Dep."), attached hereto as Exhibit D, at 76:1–4.) The bulk of Kimmell's career experience is in IT. (*See generally* Kimmell C.V.) He has a bachelor's degree in accounting from the University of Akron, a master's degree in accounting information systems, and is a licensed certified public accountant. Kimmell also has a number of professional certifications related to IT. (*See id.*) None of the certifications concerned projecting wages or anything of a related nature. (*See* Kimmell Dep. at 11:13–33:10.) Kimmell did not describe any training that aided him in conducting this analysis.

Currently, Kimmell runs his own company, Kimmell Cybersecurity, LLC, which "manage[s] IT services." (*Id.* at 65:13–66:3.) This includes managing IT infrastructure, penetration testing, security, assessments, and strategic planning. (*Id.*) Since 1998, most of Kimmell's work has focused on or involved IT. Before starting his company in 2013, Kimmell worked in an IT job for SecureState, LLC. (*See* Kimmell C.V.; Kimmell Dep. at 54:2–55:19.) Kimmell has also worked in jobs for United Way of Summit County, Hamlin Steel Products, and S&V Industries, where he worked in both IT systems and accounting. (*See* Kimmell C.V.; Kimmell Dep. at 43:24–46:24, 52:3–54:1.)

Before he started working in IT, Kimmell worked as an auditor at Ernst & Young for about two years, where he worked with company financial statements and employee benefit plans. (*See* Kimmell C.V.; Kimmell Dep. at 42:14–43:23.) Kimmell's only other experience is as a lecturer

2

at the University of Akron, where he taught courses in information systems security, financial accounting, and data modeling and analysis. (*See* Kimmell CV; Kimmell Dep. at 47:1–13.) The data modeling course involved using business data to explore the functionality of Microsoft Excel, with a focus on "learning how to use the tools of Excel." (*See* Kimmell Dep. at 50:3–51:15.) Although Kimmell had payroll responsibilities in some of these jobs, none were in healthcare and none required him to forecast future wages. (*See generally* Kimmell Dep.) He has no experience in healthcare settings. (*Id.* at 102:9–11.)

    C.    Kimmell's Methods

Kimmell reached his conclusion by taking the difference between Plaintiff's wages in 2021 (her last full year working at NCH) and forecasting annual increases of 3% (for the lower bound) and 5% (for the upper bound) each year through 2032 to determine how much she would have made had she stayed working at NCH. (*See* Working Paper.) He then compared that number against Plaintiff's actual wages for 2022 through 2024 and a forecasted actual wage using the same percentage increases for 2025 through 2032. (*See id.*) Kimmell testified that his projections are based solely on total wages earned, without regard for the number of hours worked, the source of those wages, or how much of the income resulted from overtime work. (Kimmell Dep. at 108:8–18.) Kimmell described this as the "before and after" method of calculating lost wages. (*Id.* at 93:18–21.) He extended his forecast through 2032 because he believes that it will take at least that long for Plaintiff to recover her career after being terminated. (*See id.* at 116:9–13; Working Paper.)

Although it was his first time doing this sort of analysis, Kimmell did not consult with any experts in the field on how to do it. (*Id.* at 86:16–19.) He testified that he visited "three or four different sites," but could not identify any of them. (*Id.* at 87:1–12.) Kimmell is also not aware

3

of any peer-reviewed publications that discuss his method. (*Id.* at 94:6–8.) He initially testified that the method is accepted in the field, but, when pressed, admitted that he actually does not know whether the method is accepted by other experts in the field. (*Id.* at 94:3–15.)

Kimmell also opined that Plaintiff was terminated because of NCH's "malfeasance." (*See* Working Paper.) In his opinion, "employers shouldn't require someone to get a vaccine that has not been properly tested for a virus that's 99.9 percent survivable and has an alternative solution being Ivermectin." (*Id.* at 86:5–9.) Kimmell does not appear to have used any methodology in coming to that opinion or have expertise to allow him to draw the conclusion.

### D. Information Kimmell Considered

Kimmell considered minimal information. In the Report, he listed Plaintiff's tax returns from 2018 through 2024; Plaintiff's 2024 W-2; Plaintiff's retirement account; and Plaintiff's unemployment compensation as the only documents he considered. (Report at 6.) Kimmell also testified that, despite not including it in the Report, he also read the Complaint. (Kimmell Dep. at 85:11–15.)

In conducting this analysis, Kimmell did not consider:

- The hourly wage rate Plaintiff was paid at NCH or her new job. (*Id.* at 111:8–13.)[1]

- How often Plaintiff would have received a pay raise at NCH. (112:11–15.)

- Plaintiff's physical ability to work during her last year at NCH. (*Id.* at 90:13–18.)

---

[1] Kimmell learned for the first time at his deposition that, in her current job, Plaintiff makes only about $0.50 per hour less than she made at NCH. (Kimmell Dep. at 113:10–14 [Q: Are you aware that's only about $.50 per hour less than she was making at NCH. A: Yes. Q: How are you aware of that? A: You just told me.].)

4

- The amount of overtime hours available to people in Plaintiff's prior position at NCH or with her current employer. (*Id.* at 109:8–23, 110:12–19, 115:8–12.)

- Whether Plaintiff was an hourly or salaried employee. (*Id.* at 111:2–3.)

Kimmell did not speak to Plaintiff at all (*id.* at 80:7–8), so he was not able to ask Plaintiff about the amount of hours she was willing to work, whether she wanted to work overtime, how long she planned to work before retirement, how her 2022 femur injury impacted her ability to work, or any other questions related to the analysis. In fact, Kimmell did not know Plaintiff's age at the time of his deposition and did not consider it in the analysis, despite testifying that age is relevant to the amount of future years to include in the analysis. (*Id.* at 100:8–15, 119:15–120:2.) Kimmell also did not review the typical retirement age for nurses. (*Id.* at 120:5–7.)

Kimmell's assumption that an extended forecast of damages is appropriate due to the difficulty of "recovering" a career after being terminated was based on his own experiences seeing people terminated. (*Id.* at 118:1–5.) In addition to not asking Plaintiff about her experiences, Kimmell did not attempt to research the subsequent career outcomes for terminated nurses or review studies of the labor market for nurses. (*Id.* at 118:6–16.)

For his opinion on the propriety of vaccine requirements, Kimmell relied on "[d]ifferent publications," which he could not cite. (*Id.* at 86:10–15.)

### III. STANDARD OF REVIEW

The admissibility of expert opinion testimony is governed by the Federal Rules of Evidence. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 587 (1993). Federal Rule of Evidence 702 provides that a witness can be "qualified as an expert by knowledge, skill, experience, training or education." Fed. R. Evid. 702. Once a witness is qualified as an expert,

5

Rule 702 requires the party proffering the expert testimony to establish by a preponderance of the evidence:

> that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

*Id.*

Trial judges must serve as gatekeepers to the admission of expert testimony. *See Daubert*, 509 U.S. at 589. "[E]xpert evidence can be both powerful and quite misleading." *Id.* at 595 (citation omitted). Thus, as the Sixth Circuit has admonished, "because expert witnesses are not necessarily always unbiased scientists," determining the admissibility of expert testimony requires "close judicial analysis." *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 252 (6th Cir. 2001) (quoting *Turpin v. Merrell Dow Pharms., Inc.*, 959 F.2d 1349, 1352 (6th Cir. 1992)). District courts must therefore exercise their gatekeeping role to ensure that proffered testimony is both reliable and relevant. *See Wellman v. Norfolk & W. Ry.*, 98 F. Supp. 2d 919, 923–24 (S.D. Ohio 2000).

IV. **LEGAL DISCUSSION**

    A.    <u>Kimmell Is Not Qualified to Testify as an Expert in Modeling Damages or Lost Wages</u>

As a threshold matter, Kimmell is not qualified to model lost wages or damages as an expert witness. The first step in assessing whether expert testimony is admissible is determining whether the witness is "qualified by knowledge, skill, experience, training, or education." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (quotation omitted). This assessment is "context-specific" because courts are asking whether the witness is qualified to

6

answer a specific question. *Navarro v. P&G*, No. 1:17-cv-406, 2021 U.S. Dist. LEXIS 43140, at *8 (S.D. Ohio Mar. 8, 2021) (citing *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)).

None of the five factors in Rule 702 support a determination that Kimmell is an expert in the matters he addresses in his report. Prior to this case, Kimmell had no experience modeling damages or lost wages. It also does not seem that he has any knowledge or skill of how to do so. His efforts to gain knowledge in this area consisted only of reviewing a few sources on the topic, none of which he could identify in his deposition. He did not consult with any other experts in the field about how to do the analysis, the proper factors to consider, or any other matter related to his report. There is a similar lack of evidence of any skill. Indeed, as discussed below, Kimmell failed to consider basic factors related to Plaintiff's potential damages, including her rate of pay and willingness to continue working.

Kimmell's education and professional training also do not support a finding of expertise in this area. None of Kimmell's education or professional training concerned modeling damages. Although he has experience working with payroll, none of it involved forecasting future wages or determining if any wages were lost as a result of a change in employer. Plaintiff will be unable to identify any basis that would begin to qualify Kimmell as an expert in damage modeling, let alone one that meets the standards of Rule 702.

The Court can exclude Kimmell's purported expert testimony on the grounds that he is not a qualified expert.

    B.    <u>Kimmell Did Not Use a Reliable Method or Consider Sufficient Facts and Data</u>

Kimmell's "before and after" method is not reliable. As applied here, the method takes the wages Plaintiff earned with NCH in 2021 and adds a 3% or 5% yearly increase and then compares each year against either Plaintiff's actual wages (for 2022 through 2024) or an annual 3% or 5%

increase applied to Plaintiff's 2024 wages. The method does not account for hourly wage rate, hours worked, availability of overtime work, or the reasonable length of time that Plaintiff would work as a nurse prior to retirement.

Per *Daubert,* district courts' "primary function as gatekeepers is to determine whether the principles and methodology underlying the testimony itself are valid." *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000) (quoting *United States v. Bonds*, 12 F.3d 540, 556 (6th Cir. 1993)). In *Daubert*, the Supreme Court set out several factors to assist courts in deciding whether a method is reliable: (1) the testability of the expert's hypothesis; (2) whether the methodology is subject to peer review and publication; (3) the known or potential error rate; and (4) whether the method is generally accepted. *See Rose v. Truck Ctrs., Inc.*, 388 F. App'x 528, 535 (6th Cir. 2010) (citing *Daubert*, 509 U.S. at 593–94).

Kimmell testified that he did not know if the method was peer-reviewed, published, or generally accepted in the field. (Kimmell Dep. at 94:3–15.) Given that Kimmell's analysis is forward-looking, it is not easily tested at this point, but past data shows that the assumption of a 3% or 5% increase in wages per year is flawed. In each of Plaintiff's last two years with NCH, her wages went down from the previous year. (*See* Working Paper (showing 10.8% decrease from 2019 to 2020 and 9.6% decrease from 2020 to 2021).) Kimmell did not make an attempt to determine whether a 3% or 5% wage increase was reasonable for nurses in either Plaintiff's job at NCH or her current job. He based his estimated increases only on his own business experience, none of which involved healthcare employees. (Kimmell Dep. at 102:3–11.)

On the last factor, there is significant potential for error in Kimmell's calculations. First, Kimmell explained ignoring the evidence that Plaintiff's wages at NCH had actually decreased in recent years by saying there were "special circumstances" that led to the decreases in those years

8

and that there were also variations in the amount of overtime hours worked. (*Id.* at 106:7–21.) Yet, Kimmell said that he did not account for special circumstances in his projections and assumed that overtime would remain constant. (*Id.* at 106:7–18, 109:8–12.) Kimmell did not make any effort to determine how much, if any, overtime Plaintiff would be able to work either at NCH or her new job. (*Id.* at 109:8–12, 110:12–15.) He also did not determine whether Plaintiff would choose to work overtime if it was available, even though she had voluntarily reduced her nursing hours to 16 hours per week with NCH prior to the events of this case. (*Id.* at 109:13–17, 110:16–19.)

Kimmell's failure to conduct any review of information related to overtime is even more striking given the importance of the issue to his analysis. Although Kimmell was not aware of how Plaintiff was paid (*id.* at 111:2–3), Plaintiff was paid on an hourly basis. (*See id.* at 112:20–113:8, Ex. 7.) The difference between Plaintiff's current hourly pay rate and what she was making at NCH is only about $0.50 per hour. (*Id.* at 113:10–12.) Kimmell concluded the yearly difference between what Plaintiff would have made at NCH and what she will make in her current job is between $22,306 and $42,049, depending on the year. (*See* Working Paper.) Kimmell admitted that variations in the hourly wages between the two jobs would not support such significant differences. (Kimmell Dep. at 114:15–19.) The only factor that could support the differences Kimmell found would be variations in the amount of overtime available. (*Id.* at 114:20–23.) This means that Kimmell never sought information on the only factor that would support his damages conclusions.

Kimmell also never talked with Plaintiff to assess whether there are factors specific to her that would impact the analysis. For example, Plaintiff is almost 64 years old, having been born on December 27, 1961. (Deposition of Laurie Steele, attached hereto as Exhibit E, at 10:4–5.)

9

Kimmell ran his forecast through 2032, meaning it would end when Plaintiff was 72. Because he never spoke with Plaintiff, Kimmell would have been unable to determine whether Plaintiff actually planned to work until that age. From Plaintiff's testimony, there is reason to believe that she may not even work that long. In addition to reducing her nursing hours before leaving NCH, Plaintiff testified that she does not believe in working 12-hour shifts. (*Id.* at 159:11–15.) Kimmell never even considered Plaintiff's age. (Kimmell Dep. at 100:12–15.)

Kimmell similarly failed to probe his conclusion that the forecast should run until 2032 due to the purported difficulty in recovering one's career after being terminated. Kimmell admitted that he has no personal experience that would allow him to determine the difficulty nurses or healthcare workers face after being terminated, only workers in his field. Kimmell also did not do anything to gain knowledge regarding the career outcomes for terminated nurses, despite significant numbers of nurses who were terminated around the same time and for the same reasons as Plaintiff. (*Id.* at 118:6–13.) Like the rest of his analysis, Kimmell made this assumption without tying it to any facts specific to Plaintiff's case.

Turning to Kimmell's conclusion that Plaintiff's termination constituted malfeasance because COVID-19 is 99.9% survivable and can otherwise be treated by Ivermectin, Kimmell stated only that it was based on "statistics [he] had read" in different publications which, like the sources for his other opinions, Kimmell could not cite.[2] (*Id.* at 86:2–15.)

---

[2] Kimmell's inability to cite a source for this contention is unsurprising given that his statement is false. *See* U.S. Food & Drug Administration, *Ivermectin and COVID-19*, https://www.fda.gov/consumers/consumer-updates/ivermectin-and-covid-19 (last accessed Oct. 8, 2025) ("There continues to be interest in a drug called ivermectin for the prevention or treatment of COVID-19 in humans. The FDA has not authorized or approved ivermectin for use in preventing or treating COVID-19 in humans or animals . . . The FCA has received multiple reports of patients who have required medical attention, including hospitalization, after self-medicating with ivermectin")

Kimmell's expert opinion is based on a method for which he can cite no sources and which appears to ignore nearly every relevant factor—hourly wage, hours worked, overtime hours available, age, retirement planes, industry factors—for determining how much income a person can expect to make over a set period of time. To the extent the method exists at all, it is foundationally unreliable in addressing the facts of this case.

## V. CONCLUSION

Kimmell is not an expert in economic forecasting or damages modeling; he has no qualifications to offer the types of opinions contained in the Report. Even if he were qualified, Kimmell failed to consider most of the relevant factors for calculating future wages. The Court should accordingly exercise its gatekeeping function and exclude his testimony and Report.

    Respectfully submitted,

/s/ *William G. Porter*
William G. Porter (0017296), *Trial Attorney*
Daniel J. Clark (0075125)
Brian W. Dressel (0097163)
Mackenzie M. Leadston (0104771)
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street, P.O. Box 1008
Columbus, Ohio 43216-1008
Telephone/Facsimile: (614) 464-6436
*wgporter@vorys.com*
*djclark@vorys.com*
*bwdressel@vorys.com*
*mmleadston@vorys.com*

*Counsel for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was electronically filed with the U.S. District Court for the Southern District of Ohio, on October 8, 2025, and served upon all parties of record via the Court's electronic filing system.

/s/*Brian W. Dressel*
Brian W. Dressel